# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LEE KESTER,                                    )
                                      )
       **Plaintiff,**               )
                                        )     **CIVIL ACTION**
v.                                  )
                                        )     **No. 01-2476-CM**
SHAWNEE MISSION UNIFIED SCHOOL            )
DISTRICT NO. 512,                              )
                                        )
       **Defendant.**            )

## MEMORANDUM AND ORDER

On September 25, 2001, plaintiff Lee Kester filed suit against defendant Shawnee Mission Unified School District No. 512 ("School District") alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, unequal pay in relation to plaintiff's male co-workers in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), retaliation in violation of the EPA, 29 U.S.C. § 215(a)(3); disability discrimination in violation of both Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12001 *et seq.*, and the Kansas Acts Against Discrimination ("KAAD"), Kan. Stat. Ann. § 44-1001 *et seq.*, and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 24 U.S.C. § 2601 *et seq.*  Pending before the court is defendant's Motion for Summary Judgment (Doc. 110).

## I.     Facts

**Plaintiff's Employment with Defendant**

In 1995, plaintiff Lee Kester, a female, was hired by defendant as the Classified Personnel and Benefits Administrator in the Human Resources Department.  At that time, she reported to Delores Lewis,

Manager of Human Resources for the School District.  On March 16, 1996, Rob Winter was promoted to the Manager of Human Resources.

In January 1998, plaintiff's title changed to Classified Personnel Administrator, but her duties remained the same.  Plaintiff's job description as Classified Personnel Administrator for the 1997/1998 year stated: "Is responsible for the general coordination, organization and supervision of the Classified Human Resource programs.  Assists in general policy making and provides leadership for the implementation of personnel policies for Classified Personnel.  Responsible for all District employee benefit programs."  Plaintiff supervised four employees in the Human Resources Department.

Dr. Marjorie Kaplan has been Superintendent of the School District from 1991 to the present.  Directly reporting to Dr. Kaplan are the Deputy Superintendent Robert DiPierro and three Associate Superintendents for elementary services, administrative services, and educational services, respectively.

Mr. DiPierro has been Deputy Superintendent for the School District since 1992.   In that capacity, Mr. DiPierro's duties include, inter alia, supervising the Managers of the Human Resources Department.

Plaintiff is employed by defendant pursuant to a one year contract that is subject to renewal every year.  Plaintiff's contract runs from July to June the following year.  Employees are evaluated on a yearly basis and if the employee is not performing adequately, then his or her supervisor makes a recommendation for non-renewal of the employee's contract in March.  Mr. Winter, as plaintiff's supervisor, never made a recommendation for the nonrenewal of plaintiff's contract.  Plaintiff's contract was renewed for July 2000 to June 2001.

Plaintiff received employee evaluations each year she was with defendant.  Plaintiff's performance was generally satisfactory with the exception of communications with her supervisor Mr. Winter and other staff.

**Unequal Pay Complaints**

In 1998, plaintiff complained in a staff meeting with Mr. Winter and Virginia Lyon that she should be paid more or should be paid the same for doing less.  She believed her job was as worthy to the School District as that of the Manager of Human Resources.

On or about April 14, 2000, plaintiff told Mr. Winter that she was aware that another female employee, Diane Smith, had or was planning to file a formal unequal pay complaint against defendant.  Mr. Winter told plaintiff that he knew better than to talk to Mr. DiPierro about the situation and that Ms. Smith was "on a lot of thin ice."

**Recommendation of Ms. Neighbor**

On January 27, 1999, plaintiff made a recommendation to hire Cindy Neighbor for the benefit technician position.  Mr. Winter denied the recommendation and told plaintiff to re-interview other applicants for the position.

**Plaintiff's First FMLA Medical Leave**

Plaintiff saw a counselor off and on from 1979 to 1999 for counseling related to stress or anxiety in her work and family.  She was diagnosed with acute anxiety and acute depression by Dr. Michael Ausmus, and underwent treatment over a period of several years for stress, anxiety, and depression from Dr. Ausmus, Dr. James L. Donley, and Carroll Hoskins, a licensed psychotherapist.

From February 19, 1999 to May 20, 1999, plaintiff requested and was granted FMLA leave for health reasons due to stress, depression and anxiety.  Dr. Ausmus permitted plaintiff to return to work on

-3-

May 24, 1999, but ordered that she continue treatment under his care.  Plaintiff testified that she was not disabled when she returned from FMLA leave in May 1999.

**Administrative Error Regarding Vacation Pay**

While plaintiff was on FMLA leave in February 1999, defendant docked plaintiff's vacation time in violation of defendant's policy.  In July 1999, plaintiff discovered that she had no paid vacation time because she had been erroneously paid for fourteen days of accrued unused vacation at the time of her FMLA leave.  Plaintiff filed a formal grievance pursuant to defendant's policy regarding the vacation pay.  Defendant offered to have plaintiff repay the fourteen days of vacation time and take paid vacation, or take unpaid vacation.  Plaintiff chose to take unpaid vacation.

**Plaintiff's Conference Attendance**

On May 25, 1999, after plaintiff returned from her FMLA leave, Mr. Winter denied plaintiff's previously approved attendance at a SHRM conference to be held in June 1999 because of work demands.  The SHRM conference was an annual conference for which plaintiff received approval and funding to attend prior to taking FMLA leave.  Plaintiff acknowledged that there was a lot of work to do.

On August 22, 2000, Mr. Winter informed plaintiff that she could not attend an AASPA conference that defendant had paid for and for which she received approval to attend.  Plaintiff told Mr. Winter that she thought he was discriminating and retaliating against her by denying her attendance at this conference.  In response, Mr. Winter told plaintiff to file an EEO complaint.

**Plaintiff's Deposition in Schmidt Case**

On May 27, 1999, plaintiff gave deposition testimony in a lawsuit filed by Diane Schmidt. Counsel for Ms. Schmidt had previously been advised by defendant that plaintiff was on medical leave and was

unavailable for her deposition until after May 20, 1999.  In her deposition in the Schmidt case, plaintiff was first asked if she had taken administrative leave, and she answered that she had taken health leave.  Counsel for Ms. Schmidt then asked plaintiff whether the health leave was for a physical or psychological condition, and plaintiff answered that it was for a physical condition.

**Plaintiff's Vacation Request and Second FMLA Leave**

In June 1999, plaintiff requested vacation for the first week in August, but her request was denied by Mr. Winter because of an administrators' workshop scheduled for August 3, 1999.  When Mr. Winter did not approve the vacation, plaintiff requested the time off from Dr. Kaplan.  After Dr. Kaplan denied the vacation request because of the administrators' workshop, plaintiff requested the same time off as a reasonable accommodation.

On July 29, 1999, plaintiff saw Dr. Ausmus, who prescribed a two week medical leave of absence beginning July 30, 1999, for her acute anxiety and depression.  Plaintiff took FMLA leave from July 30, 1999 to August 13, 1999, due to acute anxiety and depression and was allowed time off for all medical and counseling appointments.  On August 17, 1999, Dr. Ausmus stated that plaintiff was continuing under his care and could return to work on August 16, 1999.

After plaintiff returned from her second FMLA leave, she was able to perform her job duties through August 29, 2000, although she still had some ongoing medical issues.  Plaintiff stated that she only requested an accommodation to prevent a relapse.  Plaintiff does not know if she would have been suspended or terminated if she had not taken FMLA leave.

Upon plaintiff's return from FMLA leave, Mr. Winter told her he was glad to have her back, and plaintiff believed him.

It is undisputed that plaintiff was never denied FMLA leave.

Plaintiff no longer considered herself disabled as of December 2000. Plaintiff's physician released her with no restrictions in January 2001.

**Plaintiff's Complaint Letter**

On September 30, 1999, plaintiff sent a complaint in memorandum format to Dr. Kaplan regarding the exacerbation of her depression and anxiety due to her supervisors' conduct.

**Suspension of Campus Police Officer**

On February 24, 2000, plaintiff participated in the suspension of a campus police officer for carrying an unauthorized weapon. Plaintiff acknowledged this was part of her responsibilities as Classified Personnel Administrator. The campus police officer's supervisor and the school's vice principal also participated in the suspension meeting. During the meeting, the employee was irate and attempted to draw a weapon.

On that same day, plaintiff sent a formal written complaint of retaliation to Dr. Kaplan, alleging that Mr. DiPierro intentionally sent plaintiff to interview a campus police officer who was recommended for termination without informing her that the employee was extremely volatile and dangerous. Plaintiff believed that she was placed in this dangerous situation in retaliation for her September 30, 1999 letter to Dr. Kaplan in which plaintiff complained about Mr. Winter's and Mr. DiPierro's lack of effective supervision and discussed the exacerbation of her disabilities due to her supervisors' conduct.

**Personnel Files**

On April 14, 2000, a letter of reprimand against a Shawnee Mission Northwest High School police officer was not in the personnel file when plaintiff went to retrieve it. Plaintiff sent a memo to Mr. Winter

inquiring about what had happened with the reprimand. Mr. Winter responded that Gene Johnson, the principal of that school, had removed the letter from the file even though it was a written warning, signed and issued to the employee. This was done without plaintiff's knowledge, even though she was in charge of this employee's file.

**Changes in Plaintiff's Responsibilities and Reporting Structure**

On April 13, 2000, Mr. DiPierro sent a memorandum to plaintiff requesting that she no longer directly communicate via email with Dr. Kaplan regarding Administrative Proposals for the Classified Policy Manual, but to direct such concerns to Mr. Winter. Plaintiff understood Mr. DiPierro's memorandum to eliminate plaintiff's authority to recommend terminations directly to Dr. Kaplan and instead, direct plaintiff to make a recommendations for handling employees who had exhausted FMLA leave to Mr. Winter who, after reviewing the recommendation, would have plaintiff send them on to Dr. Kaplan for approval.

On or about April 17, 2000, plaintiff sent a memo to Mr. Winter expressing her concern about being unable to contact the superintendent in accordance with what she believed was Board policy. In her memo to Mr. Winter, plaintiff specifically expressed concern about terminating employees while on FMLA leave because, under federal statute, plaintiff could be sued personally. In fact, at the time she sent this memo to Mr. Winter, plaintiff had been named personally in a lawsuit for discharging a district employee upon the expiration of the employee's FMLA leave, but while the employee was still on medical leave. Defendant's Personnel Policies for Non-Exempt Classified Employees manual states:

> Dismissal may be implemented only by the superintendent of schools (or designee) upon written recommendation of the classified personnel administrator. . . . Transfers of employees to a different position, building or work assignment may be recommended by the building principal or department head to the classified personnel administrator if he or she feels the best interest of the district would be served by such transfer. . .

> .[P]roposed transfers of employees must be approved prior to the effective
> date by the classified personnel administrator. . . . The classified personnel
> administrator should be consulted before any written reprimand or
> unsatisfactory performance review is issued to an employee.

The title page of the Personnel Policies for Non-Exempt Classified Employees manual also states: "This policy book is not all inclusive, and is intended as a set of guidelines."

Dr. Kaplan was not aware of any change in policy requiring plaintiff to submit all reports and recommendations for termination to Mr. Winter or Mr. DiPierro before submitting them to Dr. Kaplan. According to Dr. Kaplan, up until plaintiff's termination, plaintiff still had the authority to go directly to Dr. Kaplan with recommendations for termination.

**Plaintiff's Medical Expenses**

During the spring of 2000, plaintiff was having difficulty getting some of her medical bills paid. After contacting Candice Chadwick, the benefits technician, and Bob Herduin, the benefits consultant, the problem with the payments was resolved, although not as quickly as plaintiff would have liked.

**Plaintiff's Recommendations**

On or about April 26, 2000, Mr. Winter told plaintiff that he would not approve a performance evaluation plaintiff had completed on her assistant, Patty Iseman. Plaintiff recommended that Ms. Iseman's position be upgraded in pay because of her increased job responsibilities. Mr. Winter wanted all references to the increase in responsibility and the request for an increase in salary removed from the evaluation. During this same time frame, Tim Rooney requested an increase in pay for his two assistants because their duties had increased due to a software implementation. Mr. DiPierro granted Mr. Rooney's request.

-8-

Although plaintiff's recommendations regarding her assistant's pay were disregarded after her second FMLA leave, plaintiff is unaware of how many managers' recommendations were requested, granted, or disregarded by Mr. DiPierro.

**Manager's Use of Human Resources Staff**

Without first seeking her permission, managers, including Mr. Rooney, gave assignments to plaintiff's assistants, including Ms. Iseman.  As a result, plaintiff did not miss any deadlines, but was forced to stay late to complete her work.  While some managers circumvented plaintiff, plaintiff did not know if the managers also circumvented male employees.

In response to plaintiff's concerns about Mr. Rooney assigning Ms. Iseman projects without any approval, Mr. Winter told plaintiff that Ms. Iseman should seek plaintiff's approval before performing projects for other managers.

**Use of Plaintiff's Budget**

On May 8, 2000, plaintiff had a meeting with Mr. Winter inquiring about the lack of funds in her budget.  She told Mr. Winter that someone had been using the money out of her budget account, and the only people authorized to sign off on the account were Mr. Winter and plaintiff.  Mr. Winter stated that he had not given anyone authorization to use any of the funds.  Soon after, plaintiff realized that Rich Cavallaro, Manager of Information Services, and Mr. DiPierro had used $9,500.00 out of plaintiff's budget for Mr. Cavallaro's recruitment efforts.

On May 15, 2000, plaintiff sent an e-mail to Mr. Winter stating that she had been informed there was no money left in her budget account for overtime hours because someone other than plaintiff had authorized expenses from her budget.  As a result, plaintiff requested that the budget be placed under either

Mr. Winter's authority or Mr. Rooney's authority to better control the funds.  On or about May 17, 2000, Mr. Winter told plaintiff that Mr. DiPierro believed that plaintiff had discussed the $9,500.00 budget issue with Ms. Neighbor, a female board member, and now Mr. DiPierro was going to get "revenge."  On May 18, 2000, Mr. DiPierro went to plaintiff's office and was laughing because he thought it was funny that he had helped Mr. Rooney use up plaintiff's overtime budget without her approval.  Mr. DiPierro told plaintiff that he probably should not have signed the authorizations without sending them through Human Resources. Plaintiff then told Mr. DiPierro that she wanted him to take over the budget or assign the responsibility to Mr. Winter because she could no longer manage it if other employees were allowed to take money out of it without her knowledge or approval.  Mr. DiPierro told plaintiff that he did not care what she thought and she could talk to Mr. Winter.

**Employee Termination Situation with Mr. Rooney**

On July 19 through July 26, 2000, Mr. Rooney was supposed to make a written recommendation, per policy, to terminate one of his employees because the employee was not qualified to perform her job. Instead, Mr. Rooney suggested to the employee that Human Resources could transfer her to another position, which was not true.  This employee was upset about receiving mixed messages.  The employee then left the building without the required conference between Mr. Rooney and plaintiff pursuant to defendant's policy, and stated that she was going to file an EEO complaint.  Plaintiff asked Mr. Winter on two occasions to talk to Mr. Rooney about the situation with the employee's termination, but Mr. Winter failed to do so.  Mr. Rooney did not comply with plaintiff's directions concerning the policies and procedures that were supposed to be followed in terminating the employee even though it was plaintiff's job responsibility to document the recommendation for the termination of this employee.

-10-

On July 26, 2000, another employee contacted plaintiff and warned her that the "boys club" wanted to dump Mr. Rooney's employee termination situation on plaintiff. This employee informed plaintiff that Mr. Rooney was not following her recommendation and that Mr. Winter was not supporting her recommendation.

**Mr. Cavallaro's Placement of Employees on Higher Salary Schedules**

Defendant's Personnel Policies for Non-Exempt Classified Employees states that "placement of employees on the appropriate salary schedule will be determined by the classified personnel administrator for all classified employees." It also states that "the superintendent of the school, upon the recommendation of the classified personnel administrator, may authorize placement of employees above the mid-point of the current salary range for the position up to and including a maximum rate of the salary range."

In the summer of 2000, the Information Systems department had a vacant position for a System Analyst. On August 18, 2000, after unsuccessfully attempting to fill the position, Mr. Cavallaro requested Mr. Winter's help in transferring Russ Potter to the position and increasing Mr. Potter's salary in an amount greater than the 10% employees typically received as a result of an internal promotion. Mr. Cavallaro's rationale for the increase was to reward Mr. Potter for his loyalty and avoid losing him to a higher paying employer. Mr. Cavallaro also requested a transfer and more than a 10% salary increase for a female employee in his department, Carla Hale. Mr. Winter consulted with plaintiff and with Mr. Cavallaro regarding these requests. On August 21, 2000, Mr. Winter sent a memorandum to Mr. DiPierro seeking his opinion on the requests because they were outside of defendant's normal practices and procedures. Defendant has gone outside its normal practices and procedures in the past when there was a lack of

qualified applications in the information systems field and to retain employees.  On August 24, 2000, after

discussing the issues with Dr. Kaplan, Mr. DiPierro approved Mr. Cavallaro's requests.

On August 21, 2000, Mr. Cavallaro sent an e-mail to Ms. Iseman regarding a pay raise for one of

his employees that was higher than what was allocated in defendant's policies and procedures handbook.

Mr. Cavallaro did not seek plaintiff's approval for the increase in pay.

**Mr. DiPierro's Comment Regarding Susan Giffee**

On August 21, 2000, plaintiff met with Mr. Winter and Mr. DiPierro to discuss a lawsuit against

defendant alleging the mishandling of a life insurance enrollment and claim.  Plaintiff worked directly with

attorneys from the insurance carrier to represent the defendant in this issue,  which previously had been

handled by the former benefits coordinator, Susan Giffee.  Mr. DiPierro stated to plaintiff that Ms. Giffee

was a "know it all woman."  He stated that defendant's defense should be that Ms. Giffee had made an

incorrect decision, but that it was outside the scope of her authority, and defendant was therefore not

responsible.  Plaintiff warned Mr. DiPierro that his position on this matter was not legally plausible.

**Meeting with Legal Counsel**

On August 29, 2000, a meeting was held with Curtis Tideman, defendant's outside legal counsel,

Mr. DiPierro, Mr. Winter, Ms. Lyon, Ms. Chadwick, and plaintiff to discuss litigation against defendant as

well as procedures to follow when employees exhausted all of their FMLA leave.  Plaintiff brought a voice-

activated recorder to the meeting.  Plaintiff talked with her husband, an attorney, prior to the meeting to see

if she could tape record the meeting, and plaintiff's husband told her that it would be a good idea because it

would give her a complete record of what was said, what advice was given and what procedures she was

to follow.  Plaintiff had not requested or informed anyone at the meeting that she wanted to tape the

-12-

meeting.  Plaintiff had not taped other meetings with outside legal counsel, although she had tape recorded meetings with district employees in the past without being reprimanded, and without having to return the tape recording to defendant.

Plaintiff put the tape recorder on the table in front of her in plain view of everyone.  Mr. Winter observed plaintiff's tape recorder during the course of the meeting.  During the meeting, the first side of the tape ended and plaintiff took the tape out of the recorder and flipped the tape over onto the second side.  Neither Mr. Winter nor Mr. DiPierro asked plaintiff why she was tape recording the meeting.  During a break in the meeting, Mr. Tideman asked Mr. Winter why plaintiff was tape recording the meeting.  When the meeting reconvened, however, nothing was said to plaintiff about tape recording the meeting.

Initially, Mr. Tideman and plaintiff met privately to discuss why she had made the tape recording.  Plaintiff told Mr. Tideman that she needed to record the meeting because she was taking medication and had an ADA issue that made her think she would not remember everything that was said during the two-and-a-half hour meeting.  Mr. Tideman did not ask that the tape be returned but expressed his concern that the tape recording contained information that was protected by attorney/client privilege.   Plaintiff offered to provide Mr. Tideman with a copy of the tape recording, and he responded that he would consider her offer.

After the discussion with Mr. Tideman, plaintiff had a meeting in her office with Ms. Smith to discuss Ms. Smith's equal pay complaint against defendant.  Mr. Winter interrupted the meeting and ordered plaintiff to report to his office immediately.

Mr. Winter requested the tape of the meeting, and plaintiff refused to give it to him.  Plaintiff advised Mr. Winter that she needed the tape for her protection because there were many times that

-13-

decisions were made that were not followed through on, and she needed to ensure that she had the necessary information to protect herself.  In a separate meeting, plaintiff explained to Mr. Tideman that she taped the meeting because it was a very long meeting about a very confusing area and she was trying to get clarification and felt like she needed the tape for later reference.  Plaintiff had also witnessed disagreement after a meeting about who said what and who was going to do what and she thought the tape would be useful to her so that she could do her job and refresh her memory of the meeting as necessary.  Plaintiff also told Mr. Tideman that taping the meeting was an ADA issue because she was on medication.

Mr. Tideman advised plaintiff that defendant or defendant's counsel would hold the tape and she could listen to it any time.  When Mr. Winter asked her to return the tape, plaintiff said "or what" and he said "or you will need to go home."  Plaintiff took the tape home, and was subsequently suspended with pay on August 30, 2000.

Plaintiff offered to return the tape recording to defendant on September 6, 2000, after she received notice that defendant intended to present a resolution for her termination to the School Board on September 25, 2000.   Plaintiff returned the tape on September 15, 2000.

**Plaintiff's Termination**

After plaintiff's suspension, Dr. Kaplan made a recommendation to terminate plaintiff's employment mid-contract.  On September 25, 2000, the School Board adopted a resolution that plaintiff be given notice of its intent to terminate her contract of employment for the following reasons: (a) tape-recording confidential conferences with defendant's legal counsel without defendant's consent; (b) refusing to relinquish the audio-recording of the confidential communications when instructed to do so by her supervisor; (c) demonstrating combative behavior toward supervisors and peers; (d) demonstrating

-14-

insubordination in dealing with the decisions of her supervisors; and (e) demonstrating an unwillingness to accept and perform job assignments.

In making her recommendation for termination, Dr. Kaplan relied on conclusions drawn by Mr. Winter regarding the three additional reasons cited for plaintiff's termination, which included: (1) demonstrating combative behavior, (2) demonstrating insubordination in dealing with decisions of her supervisors, and (3) an unwillingness to accept and perform job assignments.  However, Mr. Winter claims that Mr. DiPierro and Dr. Kaplan developed the list of five reasons for terminating plaintiff's employment. Dr. Kaplan is not aware of any instances in which plaintiff demonstrated combative behavior toward her supervisors or her peers.  Dr. Kaplan did not know whether plaintiff had made any offer to return the tape prior to the time Dr. Kaplan had made the recommendation to terminate plaintiff's employment.  Dr. Kaplan is not aware of any instances in which plaintiff demonstrated an unwillingness to accept and perform job assignments.

The Clerk of the School Board notified plaintiff of the Board's resolution to terminate her contract on September 26, 2000.  On October 5, 2000, plaintiff requested a hearing before the School Board.  On October 13, 2000, the Clerk of the School Board notified plaintiff that the School Board would hold her requested hearing on November 8, 2000.  The School Board held plaintiff's requested hearing on November 8 and November 17, 2000.  At the hearing before the School Board, witnesses testified on behalf of defendant and plaintiff.  On November 27, 2000, the School Board issued its decision, finding "good cause" to terminate plaintiff's contract effective immediately.  The School Board notified plaintiff of its decision on November 28, 2000.

**EEOC Filing**

-15-

Plaintiff filed a charge with the EEOC on December 11, 2000.  The EEOC issued a right-to-sue letter to plaintiff on July 25, 2001.

**II.** **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Id.* at 670-71.  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see Adler*, 144

F.3d at 671 n.1 (concerning shifting burdens on summary judgment).  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Anderson*, 477 U.S. at 256.  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Adler*, 144 F.3d at 671.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Id.* Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.      Analysis

### A.        Title VII and ADA Discrimination 300 Day Time-Bar

Defendant first argues that it is entitled to summary judgment on all alleged conduct in violation of Title VII and the ADA that occurred more than 300 days before the date plaintiff filed her administrative charge.

Exhaustion of administrative remedies is a prerequisite to instituting an ADA or Title VII action in federal court.  *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996); *Khader v. Aspin*, 1 F.3d 968, 970 (10th Cir. 1993).  A complainant must file a charge with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event to ensure that the claim may be filed with the EEOC within the 300-day limit set forth in Title VII.  *E.E.O.C. v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988); *Waller v. Consol. Freightways Corp.*, 767 F. Supp. 1548, 1558 (D. Kan. 1991).  In a deferral state such as Kansas, a plaintiff must file Title VII and ADA discrimination charges within 300 days after the alleged discriminatory act occurred.  42 U.S.C. §

-17-

2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(2) (ADEA); *Peterson v. City of Wichita*, 888 F.2d 1307, 1308 (10th Cir. 1989).

The Supreme Court has held that the trigger of the limitations period in which to file an EEOC charge is the date an employee first learns of the alleged discrimination, even if the effects of the discrimination become more painful at a later date. *Del. State College v. Ricks*, 449 U.S. 250, 258 (1980); *see Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994) (holding discrimination claim accrues on the date an employee is notified of adverse employment decision). Plaintiff argues that even though she can not receive damages based on alleged violations occurring before February 16, 2000, the court may, under the continuing violations theory, consider these alleged violations as background for determining whether plaintiff suffered unlawful discrimination. The Tenth Circuit recognizes the continuing violations theory, which states that "events that are not part of a continuing violation are nonetheless admissible to provide relevant background to later discriminatory acts." *Hammad v. Bombardier Learjet, Inc.*, 192 F. Supp. 2d 1222, 1236 (D. Kan. 2002) (citing *Kline v. City of Kansas City, Fire Dep't*, 175 F.3d 660, 666 (8th Cir. 1999)); *see Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1248 (10th Cir. 1999). Such acts must, however, be "sufficiently related and thereby constitute a continuing pattern of discrimination." *Baty*, 172 F.3d at 1248 n.8 (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994)).

Plaintiff filed her EEOC charge on December 11, 2000; 300 days prior to this date is February 16, 2000. Applying the continuing violations theory, plaintiff is unable to recover for alleged discriminatory conduct occurring prior to February 16, 2000. However, the court may nonetheless weigh any allegations

-18-

occurring prior to February 16, 2000 as relevant background if it finds that the allegations support plaintiff's claim of a continuing pattern of discrimination.

**B.      Title VII Sex Discrimination**

In analyzing plaintiff's Title VII sex discrimination claim, the court will apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Under *McDonnell Douglas*, in order to survive summary judgment, plaintiff must first establish a prima facie case of discrimination under Title VII.  *Id.* at 802.  If plaintiff carries that burden, defendant must then articulate a facially nondiscriminatory reason for the challenged employment action.  *Id.*  If defendant makes such a showing, the burden reverts to plaintiff to prove the proffered nondiscriminatory reason is pretextual.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).

To succeed on a Title VII claim, plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action despite her qualifications; and (4) the position was not eliminated after plaintiff's discharge.[1]  *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005); *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004); *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000).

---

[1] Defendant argued that plaintiff must also prove that she was treated differently from similarly-situated male employees to satisfy her prima facie case, citing *Henderson v. Int'l Union*, 263 F. Supp. 2d 1245, 1282 (D. Kan. 2003).  The court finds that the issue of whether plaintiff was treated differently from similarly-situated employees is more appropriately analyzed in the pretext stage of the *McDonnell Douglas* burden-shifting test.  *See Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001) (finding that plaintiff may establish pretext by showing that her employer "treated the plaintiff 'differently from other similarly-situated employees who violated work rules of comparable seriousness.'" (quoting *Kendrick*, 220 F.3d at 1230)).

It is undisputed that plaintiff is a woman and therefore belongs to a protected class under Title VII. Additionally, both parties agree that plaintiff was qualified for her position.

Furthermore, the Tenth Circuit recently held that

> the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios. . . .  Indeed, where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position, but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant.

*Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).  "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Id.* (quoting *Kendrick*, 220 F.3d at 1227 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).  Here, it is undisputed that plaintiff's position was not eliminated.  Nevertheless, because defendant alleges that plaintiff was suspended and terminated because of unsatisfactory conduct, as addressed in *Plotke*, the fourth factor of plaintiff's Title VII prima facie case is irrelevant.

Accordingly, the sole issue before the court is whether defendant suffered an adverse employment action.  Defendant argues that only plaintiff's suspension and termination constitute an adverse employment action, and that plaintiff is unable to demonstrate that she was treated differently from similarly-situated employees.

The Tenth Circuit has stated that an adverse employment action is not to be narrowly defined as "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524

-20-

U.S. 742, 761 (1998)).  Rather, the Tenth Circuit has "continued to liberally define the term 'adverse employment action' and take a case-by-case approach."  *Id.* at 1033.  Furthermore, an adverse employment action may also encompass "those acts that carry a 'significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects.'"  *Id.* at 1032 (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)) (emphasis added).  Nevertheless, an adverse employment action does not include "'a mere inconvenience or an alteration of job responsibilities.'"  *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1136 (10th Cir. 2005) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000)).  "Instead, to constitute an adverse action, the employer's conduct must be 'materially adverse' to the employee's status."  *Id.* (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998).

Here, plaintiff makes general assertions that she suffered numerous adverse employment actions beyond being suspended and terminated when defendant (1) did not include plaintiff in decision-making in areas in which she had Board-authorized authority; (2) countermanded plaintiff's decisions; (3) allowed male managers to usurp plaintiff's authority by going over her head; (4) refused to share critical information with plaintiff that she needed to perform the functions of her job; (5) disregarded plaintiff's recommendations; and (6) established rules that applied only to plaintiff without Board approval.

Specifically, plaintiff's response to defendant's summary judgment motion made the following specific factual assertions in support of her position: (1) defendant did not hire a female employee that plaintiff recommended for the position; (2) Mr. Winter would not discuss a situation with plaintiff in which another employee of defendant, Ms. Smith, alleged an unequal pay charge because, as Mr. Winter said to plaintiff, Ms. Smith was "on a lot of thin ice" already; (3) defendant declined to grant plaintiff a pay increase

for her assistant, Ms. Iseman, when Mr. Rooney's two assistants were both given pay increases; (4) Mr. DiPierro told plaintiff that the former benefits coordinator was a "know it all woman"; (5) Mr. Winter told plaintiff that Mr. DiPierro believed that plaintiff spoke with Ms. Neighbor regarding a budget issue and that Mr. DiPierro was going to get "revenge"; (6) defendant denied plaintiff's attendance at three conferences that were previously approved and paid for; (7) defendant docked plaintiff's vacation time while she was on medical leave in violation of defendant's policy; and (8) plaintiff was isolated from Dr. Kaplan when defendant's policy called for plaintiff to take certain issues directly to Dr. Kaplan.

Plaintiff's primary argument is that these alleged adverse employment actions damaged plaintiff's future employment prospects. Significantly, plaintiff's first four alleged adverse employment did not affect plaintiff directly, and thus could not have affected her future employment prospects. Specifically, when defendant did not hire a female employee that plaintiff recommended for the position, refused to discuss Ms. Smith's unequal pay complaint with plaintiff, chose not to give plaintiff's assistant a raise when other assistants were given raises, and when Mr. DiPierro called a former employee of defendant a "know it all woman," plaintiff was not directly affected in any way. However, even assuming that plaintiff was directly or indirectly affected, plaintiff's future employment prospects were not affected any more severely than in a *de minimis* way.

The court also finds that plaintiff's remaining four allegations fail to constitute adverse employment actions because plaintiff has not sufficiently shown how any of her allegations caused plaintiff a significant risk of humiliation, damage to her reputation, or a harm to her future employment prospects. For example, defendant does not deny that plaintiff was denied attendance at three conferences. However, plaintiff admits that she did not lose her credentials as a result of not attending the conferences and does not

elaborate on how her absence at these conferences might affect her future employment prospects.

Similarly, plaintiff did not allege how her future employment prospects were damaged by Mr. DiPierro's

comment about getting "revenge" with plaintiff for allegedly talking with Ms. Neighbor about a budget issue,

or by plaintiff's alleged isolation from Dr. Kaplan.  Without specific assertions supported by the record

from plaintiff, the court is unwilling to speculate as to whether defendant's actions caused either a significant

or a *de minimis* impact on plaintiff's future employment prospects.

Finally, plaintiff alleges that defendant docked plaintiff's vacation time while she was on medical

leave in violation of defendant's policy.  However, not only did plaintiff again fail to assert how this action

by defendant affected her future employment prospects, but the record shows that plaintiff concedes that

her vacation was docked as a result of an administrative error by defendant in which plaintiff was

accidentally paid for unused vacation time.  After plaintiff alerted defendant of the error, defendant

corrected the error.  Without specific arguments by plaintiff regarding how a corrected administrative error

caused harm to her future employment prospects, the court finds that this action by defendant at most

caused a *de minimis* harm to plaintiff.  Therefore, aside from plaintiff's suspension and termination,

plaintiff's other alleged adverse actions fall short of the liberal requirements of *Hillig*, 381 F.3d at 1028.[2]

It is, however, undisputed that plaintiff's suspension and termination constitute an adverse

employment action.  Therefore, even finding that plaintiff's other allegations do not rise to the level of

adverse employment actions, the court finds that plaintiff sufficiently established her prima facie case, and

---

[2] As the court discusses later in its *McDonnell Douglas* burden-shifting analysis, even if the court were to determine that plaintiff's other alleged adverse employment actions did, in fact, constitute adverse employment actions, these claims would still fail because plaintiff does not dispute or rebut defendant's proffered legitimate, non-discriminatory reasons for these actions.

turns to the issue of defendant's legitimate, non-discriminatory reasons for plaintiff's suspension and termination.

Defendant argues that several things contributed to plaintiff's suspension and termination, but that the triggering factor was plaintiff's tape recording of a confidential meeting between plaintiff, Mr. DiPierro, Mr. Winter. Ms. Lyons, Ms. Chadwick, and defendant's attorneys, and plaintiff's subsequent refusal to return the audio tape to defendant.  Defendant contends plaintiff's actions amount to gross insubordination. It is undisputed that the August 29, 2000 meeting was held to discuss litigation against defendant and procedures to observe when employees exhaust their FLMA leave.  Prior to the meeting, plaintiff did not discuss tape recording the meeting with anyone.  During the meeting, plaintiff placed a voice-activated audio tape recorder on the table in plain view and recorded the meeting.  No one at the meeting said anything to plaintiff about the recorder.

Following the meeting, Mr. Winter requested that plaintiff give him the audio tape of the meeting. Plaintiff refused to return the tape.  Plaintiff was suspended with pay on August 30, 2000, and was terminated on November 28, 2000.

The court finds persuasive defendant's argument that plaintiff's refusal to give defendant the audio tape of the confidential meeting containing confidential discussions constitutes insubordination.  While the court understands that plaintiff might have needed the tape to remember what was discussed during the meeting, and that use of a tape recorder might constitute a reasonable accommodation under the ADA, plaintiff had a duty, as an employee of defendant, to either request an accommodation prior to the meeting or acquiesce defendant's request for the audio tape and subsequently seek possession or use of the tape by other means.  Even assuming plaintiff was disabled, plaintiff was not entitled to her choice of an

accommodation; plaintiff was entitled only to a reasonable accommodation of defendant's choice. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999).

Moreover, the court disagrees with plaintiff's suggestion that defendant had a duty to inquire about plaintiff's need for accommodation. While defendant would have a duty to engage in an interactive process with plaintiff to determine appropriate accommodations if defendant believed plaintiff was disabled, *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998), defendant did not have an obligation to initiate a conversation about accommodation with plaintiff after she refused to return the audio tape. Plaintiff's blatant refusal to return the tape amounted to insubordination, especially in light of the fact that defendant was willing to provide plaintiff with unfettered access to the tape, so long as the tape remained in defendant's possession. Accordingly, defendant has sufficiently demonstrated a legitimate, non-discriminatory reason for plaintiff's remaining adverse actions.

Next, the burden shifts back to plaintiff to present evidence on which a reasonable jury might conclude that defendant's proffered reason for her suspension and termination is pretextual. Plaintiff argues that defendant's proffered reasons for her suspension and termination are "facially illogical" because (1) defendant fired plaintiff based upon reasons that, less than six months earlier, were insufficient to warrant non-renewal of her contract; (2) all the other participants at the meeting that prompted plaintiff's dismissal were allowed to take notes; and (3) with regard to the meeting at issue, plaintiff was a client of defendant, either in a personal or representative capacity, and therefore the meeting was not protected by attorney-client privilege.

The court finds that none of plaintiff's arguments rise to the level of what a reasonable jury might consider pretextual. Specifically, plaintiff's first argument of pretext is faulty because the record does not

reflect insubordinate behavior by plaintiff prior to her contract renewal.  Certainly, if plaintiff was similarly

insubordinate on previous occasions and could show that her termination was linked to defendant's

allegedly discriminatory motive in this instance, then the court might find otherwise, but such is not the case

here.  As previously discussed, plaintiff could have effectuated other means of getting possession or access

to the audio tape rather than simply refusing to return it.

Similarly, if plaintiff wished to tape record the meeting as an accommodation under the ADA, she

should have followed the appropriate procedures to request an accommodation prior to the meeting rather

than refuse to return the tape.  Finally, plaintiff's third allegation of pretext also fails because even though

plaintiff herself was not protected by an attorney-client privilege, it is not unreasonable or unlawful that

defendant would not want an audio tape of a confidential meeting with its legal counsel present out of its

control.  Again, if plaintiff wanted full and unbridled use of the audio tape, she should have sought access to

it through appropriate means.

Even if plaintiff demonstrated that defendant's proffered reason for her suspension and termination

was unreasonable or unfair, this is not adequate to establish pretext.  *See Kendall v. Watkins*, 998 F.2d

848, 851 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994) (stating that when plaintiff's burden is to

prove pretext, "[m]erely showing that the reason articulated by the employer is wrong or unreasonable will

not suffice").  Additionally, plaintiff failed to establish that defendant's motive in suspending and terminating

her was discriminatory.  There is simply no evidence in the record that supports a discriminatory motive.

*See id.* at 852 (stating that even "[i]f a plaintiff successfully proves that the defendant's reasons are not

worthy of credence, the plaintiff must still prove that the true motive of the employment decision violates Title VII.").[3]

The court grants summary judgment to defendant on plaintiff's Title VII discrimination claim.

**B.      Title VII Retaliation for Sex Discrimination**

Under the first step of the *McDonnell Douglas* burden-shifting framework, plaintiff must establish a prima facie case of Title VII retaliation.  To do so, plaintiff must show that (1) she engaged in a protected activity; (2) defendant took an adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse action.  *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004).  For purposes of Title VII sex retaliation claims, protected activity is defined as opposing any practice made unlawful under Title VII, or participating in any manner in an investigation, proceeding, or hearing under Title VII.  42 U.S.C. 2000e-3(a); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002).  The protected activity element also requires plaintiff to have had a good faith belief that Title VII was violated.  *Petersen*, 301 F.3d at 1188.

Plaintiff alleges she engaged in the same protected activities she alleged in her Title VII sex discrimination claim, discussed above, as well as the following additional protected activities: (1) Mr. Johnson removing a reprimand letter from a personnel file without plaintiff's knowledge when plaintiff was in

---

[3] The court notes that each of these pretext arguments focus solely on plaintiff's suspension and termination and disregard plaintiff's other alleged adverse employment actions.  Accordingly, even if the court had determined that plaintiff's other alleged adverse employment actions did, in fact, constitute adverse employment actions, these claims would fail because plaintiff did not dispute or rebut defendant's proffered legitimate, non-discriminatory reasons for these actions.  *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396 (10th Cir. 1997) (holding that the plaintiff has an obligation to rebut defendant's proffered legitimate, non-discriminatory reasons, and that after doing so, "a discrimination case looks like any other civil case where the plaintiff 'at all times bears the ultimate burden of persuasion.'").

charge of the employee's files; (2) Mr. Cavallaro placing employees on a higher salary schedule than called

for by Board policy and not preparing a job description as required by Board policy; (3) Mr. DiPierro

intentionally sending plaintiff to interview a campus police officer who was recommended for termination

without informing plaintiff that this employee was known to be volatile and dangerous; (4) plaintiff's April

14, 2000 conversation with Mr. Winter about Ms. Smith's unequal pay complaint; (5) Mr. DiPierro's April

17, 2000 memo to plaintiff stating that plaintiff should no longer directly contact the superintendent about

administrative proposals for the classified policy manual; (6) plaintiff's April 17, 2000 memo to Mr. Winter

expressing her concern about being unable to contact the superintendent regarding her recommendations

for terminating employees who had exhausted their eligible FMLA leave; (7) Mr. Winter's April 26, 2000

denial of approval of plaintiff's performance evaluation of her assistant, Ms. Iseman; (8) plaintiff's May 2,

2000 complaint to Mr. Winter regarding Mr. Rooney instructing Ms. Iseman to complete tasks for him to

the detriment of the plaintiff's projects; (9), Mr. Winter telling plaintiff on May 17, 2000 that Mr. DiPierro

believed that plaintiff had discussed the $9,500.00 budget issue with Ms. Neighbor, and that Mr. DiPierro

was going to get "revenge"; (10), Mr. DiPierro going to plaintiff's office on May 18, 2000 and laughing

because he thought it was funny that he had helped Mr. Rooney use up plaintiff's overtime budget without

her approval, and Mr. DiPierro responding to plaintiff's protests by saying that he did not care what she

thought; (11) the July 26, 2000 warning that the "boys club" wanted to dump Mr. Rooney's employee

termination situation on plaintiff; (12) plaintiff's August 21, 2000 meeting with Mr. Winter and Mr. DiPierro

to discuss a lawsuit regarding the alleged mishandling of a life insurance enrollment and claim by Ms. Giffee;

and (13) Mr. Cavallaro's August 21, 2000 e-mail to Ms. Iseman regarding a pay raise for one of his

employees that was higher than what was allocated in the policies and procedures handbook without seeking plaintiff's approval for the pay increase.

In response to plaintiff's proffered protected activities, defendant argues that most of the facts plaintiff cites do not demonstrate that plaintiff opposed a practice made unlawful under Title VII or participated in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. 2000e-3(a); *Petersen*, 301 F.3d at 1188. The court notes that plaintiff's response to defendant's summary judgment motion simply listed each of her purported protected activities by fact number without adding any corresponding support or argument. The court will address each purported protected activity separately, but will not presume arguments not made by plaintiff.

Plaintiff's alleged protected activities numbered one, two, three, five, seven, nine, ten, eleven and thirteen involve actions taken by someone else and support plaintiff's claim that retaliation occurred, not that she engaged in protected activity. In other words, they do not demonstrate a situation in which plaintiff herself opposed a practice made unlawful by Title VII or participated in an investigation, proceeding or hearing under Title VII. For example, plaintiff's first alleged protected activity asserts that Mr. Johnson, a school principal, removed a reprimand letter from a file over which plaintiff had responsibility. Plaintiff herself did not take any action in this situation. Moreover, plaintiff does not assert, and the facts do not suggest, that Mr. Johnson removed the file in retaliation of plaintiff opposing a Title VII violation or participating in a Title VII investigation, proceeding or hearing. For this reason, the court finds that these are not protected activities as defined by 42 U.S.C. 2000e-3(a), but may support retaliation.

Protected activity number four is a situation in which plaintiff told Mr. Winter about her knowledge of Ms. Smith's unequal pay complaint.  Here, plaintiff is opposing a potential Title VII violation, *i.e.* unequal pay based on gender.  Therefore, the court finds that this situation does constitute a protected activity.

Alleged protected activities six, eight, and twelve are all facts in which plaintiff herself took some action.  However, these activities do not meet the definition of protected activities because none of them involve a situation in which plaintiff opposed a potential Title VII violation or participated in a Title VII investigation, proceeding or hearing.  For example, plaintiff's alleged protected activity number six involves a situation in which plaintiff contacted her boss, Mr. Winter, about her inability to have direct contact with the superintendent regarding recommendations for terminating employees who exhausted their FMLA leave.  The court understands that plaintiff was concerned, and possibility frustrated, about defendant limiting her communication with the superintendent.  But this fact does not suggest that plaintiff contacted Mr. Winter to oppose a Title VII violation.  Rather, she was expressing concern about a management decision; plaintiff does not assert that defendant's decision was in any way related to her gender.  In sum, these alleged protected activities do not demonstrate a potential Title VII violation or plaintiff's participation in a Title VII investigation, proceeding or hearing.

Finding that plaintiff demonstrated at least one protected activity, the court next turns to the question of whether plaintiff suffered an adverse action.  As the court has already set forth, the Tenth Circuit has stated that an adverse employment action is not to be narrowly defined as "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,'" *Hillig*, 381 F.3d at 1032-33

(quoting *Burlington Indus., Inc.*, 524 U.S. at 761), but has "continued to liberally define the term 'adverse

employment action' and take a case-by-case approach." *Id.* at 1033.

Plaintiff cites the same adverse actions she identified in her sex discrimination claim, discussed

above.  Rather than analyze these again, the court will reiterate its holding that plaintiff suffered adverse

employment actions only when she was suspended and terminated.  In addition to those previously

discussed, plaintiff also asserts that the following constitute adverse employment actions: (1) defendant

denied plaintiff attendance at a SHRM conference; (2) defendant denied plaintiff participation in a public

school administrator's conference; (3) defendant maintained a secret employment file about plaintiff; and (4)

defendant placed plaintiff in a dangerous situation with an employee known to be volatile.

Not one of plaintiff's additional facts constitute an adverse employment action.  First, defendant

denying plaintiff attendance at a conference is not an adverse employment action because plaintiff did not

indicate how her absence at these conferences might affect her future employment prospects.  In fact,

plaintiff admitted that she did not lose her credentials as a result of not attending the conferences.  Second,

defendant did not commit an adverse action by maintaining a secret file on plaintiff.  Significantly, plaintiff

abandoned this argument by not responding to defendant's arguments about this issue.  Even ignoring this

oversight, the court finds that defendant's practice of keeping working files about plaintiff does not indicate

retaliatory treatment because such files do not necessarily affect an employee's future employment

prospects, and plaintiff failed to argue how these files affected her future employment prospects.  *See*

*Dunlap v. Kan. Dep't of Health and Env't*, 2005 WL 737585 *4 (10th Cir. Apr. 1, 2005) (affirming the

district court in finding that an employer maintaining a letter of concern or reprimand, which was not placed

in the employee's personnel file, did not constitute an adverse employment action).  Third, the court might

-31-

have been willing to categorize defendant placing plaintiff in a dangerous situation with an employee known to be volatile without proper warning as an adverse employment action because adverse employment actions "are not simply limited to monetary losses in the form of wages or benefits." *Hillig*, 381 F.3d at 1031 (quoting *Sanchez v. Denver Pub. Sch*., 164 F.3d 527, 531 (10th Cir. 1998)).  However, plaintiff failed to respond to defendant's summary judgment arguments about this incident, and thus also abandoned this argument.

The court next considers whether plaintiff can demonstrate a causal connection between her protected activity and adverse action.  Plaintiff "may establish the causal connection by proffering 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  *Annett*, 371 F.3d at 1240 (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999)).

In support of her causation arguments, plaintiff also asserts that on the same day she was suspended, Mr. Winter interrupted a meeting between plaintiff and Ms. Smith regarding Ms. Smith's unequal pay complaint, and that Mr. Winter was aware that Ms. Smith and plaintiff had previously discussed this complaint.  Defendant argues that there is no evidence that Mr. Winter knew that plaintiff and Ms. Smith were meeting, let alone the subject of their meeting.  In Title VII cases, causation by definition links a protected activity with an adverse employment action, and plaintiff did not assert that Mr. Winter interrupting plaintiff's meeting with Ms. Smith constitutes a protected activity.  Nevertheless, this meeting does not rise to the level of protected activity because plaintiff has not established that Mr. Winter aware of the subject of plaintiff and Ms. Smith's meeting.

Plaintiff also raises several other causation arguments, including that she asserted her rights under Title VII several times within four months of her suspension. Significantly, however, the court has already held that plaintiff engaged in only one protected activity—the situation in which plaintiff told Mr. Winter about her knowledge of Ms. Smith's unequal pay complaint occurring on April 14, 2000—prior to the two adverse actions, *i.e.* her suspension on August 30, 2000 and termination on November 28, 2000. Therefore, at least four and a half months passed between plaintiff's protected activity and the adverse employment actions. The Tenth Circuit has held that "unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Conner*, 121 F.3d at 1395). Moreover, a four and a half month period, without additional evidence beyond temporal proximity, is insufficient to establish causation. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding that a three-month period, standing alone, is insufficient to establish a causal connection). Therefore, plaintiff failed to establish a prima facie case for Title VII retaliation.[4]

The court grants summary judgment to defendant on plaintiff's Title VII retaliation claim.

---

[4] Even if plaintiff had sufficiently demonstrated a prima facie case, the court notes that, as with plaintiff's Title VII discrimination claim, each of plaintiff's pretext arguments focus solely on plaintiff's suspension and termination; plaintiff disregards pretext arguments for the other alleged adverse employment actions. Accordingly, even if the court had determined that plaintiff's other alleged adverse employment actions did, in fact, constitute adverse employment actions, these claims would fail because plaintiff did not dispute or rebut defendant's proffered legitimate, non-discriminatory reasons for these actions. *See Conner*, 121 F.3d at 1396.

**C.      FMLA Retaliation**

Plaintiff also alleges defendant retaliated against her in violation of the FMLA.  As a preliminary matter, defendant argues that several acts occurring prior to September 25, 1999,[5] and which serve as the basis for plaintiff's claim, are barred by the FMLA's two year statute of limitations.  In response, plaintiff argues that the continuing violations theory allows plaintiff to bring claims accruing before September 25, 1999.  The continuing violation doctrine "'is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated.'" *Evans v. Dean Foods Co.*, 2000 WL 1260493, at *2 (10th Cir. Sept. 6, 2000) (quoting *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1415 n.6 (10th Cir. 1993)).  A "discrete and salient" event, however, puts a plaintiff on notice that her rights have been violated, thereby causing the continuing violations theory to fail and the two year statute of limitations to stand.  *Id.*

Here, the events occurring prior to September 25, 1999 include: (1) defendant refused to approve plaintiff's request for vacation time after she returned from her February 1999 FMLA leave; (2) plaintiff was denied attendance at a SHRM conference on the same day that she returned from FMLA leave; (3) Mr. Winter denied plaintiff's request for a pay increase for her assistant just days after returning from FMLA leave; and (4) plaintiff's vacation time was docked while she was on medical leave.

The court finds that each of these allegations is a discrete, salient event which would put a reasonable person on notice that her rights might have been violated.  For example, defendant's refusal to approve plaintiff's vacation request after she returned from FMLA leave is a discrete event which would

---

[5]   Plaintiff filed the instant claim on September 25, 2001, and a two year statute of limitations applies.  29 U.S.C. § 2617(c).

put a reasonable person on notice that her request might have been refused in retaliation for taking FMLA leave.  Defendant denying plaintiff attendance at a conference, denying a pay increase for plaintiff's assistant, and docking plaintiff's vacation time while plaintiff was on medical leave are also discrete, salient events.  Consequently, plaintiff's continuing violations theory fails, and plaintiff is precluded from asserting these claims.

"In order to establish a prima facie claim for . . . FMLA retaliation, a plaintiff must show that: (1) she engaged in activity protected under [the FMLA]; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Richmond*, 120 F.3d at 208-09 (citing *Archuleta v. Colo. Dep't of Insts.*, 936 F.2d 483, 486 (10th Cir. 1991)).

It is undisputed that plaintiff engaged in a protected activity by taking FMLA leave at least twice while employed by defendant.  At issue next, therefore, is whether plaintiff suffered an adverse employment action.  Plaintiff's complaint asserts the same adverse actions she asserted in her Title VII sex discrimination and retaliation claims, as well as one additional claim that falls within the statute of limitations—that defendant docked plaintiff's pay for absences after September 25, 1999, caused by her continued medical therapy.[6]

---

[6] Plaintiff's complaint also alleged the following adverse employment actions: (1) defendant unlawfully disseminated private confidential medical information concerning plaintiff's medical condition and leave; (2) defendant failed to reasonably support plaintiff's efforts to secure proper treatment of her medical expenses under defendant's medical plan; and (3) defendant required plaintiff to draft and implement a change in defendant's FMLA policies.  However, because plaintiff failed to respond to defendant's arguments about these allegations in her response, the court deems them abandoned.

The court has already held that the only adverse employment actions suffered by plaintiff are her suspension and termination. Plaintiff's additional alleged adverse action fails to satisfy the definition of an adverse employment action for purposes of establishing a prima facie FMLA retaliation claim because, after a careful review of the record, the court cannot find any evidence that defendant intentionally docked plaintiff's pay in violation of its policy. Plaintiff offered no specific arguments regarding this claim. Defendant argues, and plaintiff does not dispute that, even if plaintiff's pay was reduced to reflect absences for medical appointments, this situation was a result of an administrative error in which plaintiff was accidentally paid for unused vacation time. After plaintiff alerted defendant of this error, plaintiff was given the choice of either keeping the pay for her unused vacation and taking unpaid vacation, or giving the money back to defendant and taking paid vacation. Plaintiff chose the former. This error explains why plaintiff's pay might have been docked for vacation time used to take absences for medical appointments. Therefore, the court finds that plaintiff's allegation does not constitute an adverse employment action.

The court next analyzes whether there is a causal connection between plaintiff's FMLA leave and her suspension and termination. Plaintiff's only argument regarding causation is that the closeness in time between her FMLA leave and her suspension and termination justify a finding of causation. In support of this argument, plaintiff cites *Anderson*, 181 F.3d at 1179, which held that closeness in time may be sufficient, alone, to justify a finding of causation in ADA cases.

At issue here is when plaintiff exercised her protected activity. Plaintiff asserts that she took intermittent FLMA leave, presumably to attend doctor's appointments and counseling sessions, as late as August 22, 2000, shortly before her suspension on August 30, 2000. Defendant, however, argues that prior to plaintiff's response to defendant's summary judgment motion, plaintiff stated in her deposition that

-36-

she did not take any intermittent FMLA leave.  Viewing the facts in the light most favorable to plaintiff, the court finds that a causal connection could exist between plaintiff taking intermittent FMLA leave and her suspension and termination.

Once plaintiff establishes a prima facie case for her FMLA claim, the burden shifts to defendant to offer a legitimate, non-discriminatory reason for its adverse actions.  However, this court has found, as set forth above, that plaintiff's Title VII claims fail because, inter alia, plaintiff is unable to demonstrate that defendant's proffered reasons for her suspension and termination constitute what a reasonable jury might consider pretext.  The same facts apply to plaintiff's remaining FMLA claim.  Plaintiff's refusal to return an audio taped recording of a meeting with plaintiff, defendant and defendant's attorneys constitutes insubordination.  Therefore, in accordance with the court's holding on plaintiff's Title VII  allegation of pretext, the court finds that defendant's reasons for plaintiff's suspension and termination are not so weak, implausible, inconsistent, incoherent or contradictory that a reasonable fact finder could find them unworthy of belief.  *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).  Therefore, the court grants summary judgment to defendant on plaintiff's FMLA retaliation claim.

**D.     Equal Pay Act**

Plaintiff also brought suit under the EPA, but did not respond to any of defendant's summary judgment arguments or authorities regarding this claim.  Therefore, pursuant to Fed. R. Civ. P. 8(d), plaintiff has abandoned this claim and defendant is entitled to summary judgment on this claim.

**E.     Equal Pay Act Retaliation Claim**

-37-

Plaintiff also brought a retaliation claim against defendant under the EPA, alleging that defendant retaliated against plaintiff because plaintiff complained to defendant about perceived pay disparities between defendant's male and female employees.

The EPA prohibits discrimination in wages on the basis of sex for "equal work" unless such wages are paid pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1).  Employers are also prohibited from engaging in retaliation under the EPA.  29 U.S.C. § 215(a)(3) (stating that it shall be unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding . . . .").

The court will utilize the *McDonnell Douglas* burden shifting scheme when analyzing EPA/FLSA retaliation claims.  *See Conner*, 121 F.3d at 1394 (citing *Richmond*, 120 F.3d at 208-09).  To establish a prima facie case of retaliation under the EPA, plaintiff must prove: "(1) he or she engaged in activity protected by the FLSA; (2) he or she suffered adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection existed between the employee's activity and the employer's adverse action."  *Richmond*, 120 F.3d at 208-09 (citing *Archuleta*, 936 F.2d at 486).  Therefore, to succeed on her EPA claim, plaintiff must show, consistent with her allegations, that she lodged a complaint against defendant regarding unequal pay between males and females employed by defendant and was subsequently suspended and terminated in retaliation for those complaints.

If plaintiff meets this prima facie requirement, the burden shifts to defendant to show a legitimate, non-retaliatory reason for its decision.  *St. Mary's Honor Center*, 509 U.S. at 506-508.  If defendant

meets this burden, plaintiff must demonstrate that a genuine issue of material fact exists regarding whether defendant's proffered reasons are pretext for retaliatory conduct. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). Plaintiff may establish pretext by showing either "'that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.'" *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 256). Should plaintiff demonstrate both a prima facie case and evidence in support of finding that defendant's non-retaliatory reasons for its conduct are pretext, the court will deny summary judgment. *Id.* On the other hand, failure by plaintiff to come forward with evidence of pretext entitles the defendant to summary judgment. *Cone v. Longmount United Hosp. Ass'n*, 14 F.3d 526, 529 (10th Cir. 1994).

Defendant argues that to fulfill the protected activity requirement under the EPA, plaintiff must file a complaint with a federal or state agency or assert EPA rights through formal complaints at work. Thus, because plaintiff only made informal complaints to defendant regarding her wages, plaintiff did not engage in protected activity. Defendant, however, misstates the law. While the EPA prohibits retaliation for the filing of any complaint, the Tenth Circuit has chosen not to read this language literally, but to interpret the statute to protect even "'unofficial assertion of rights though complaints at work.'" *Conner*, 121 F.3d at 1394 (quoting *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984)); *see also McMillin v. Foodbrands Supply Chain Servs., Inc.*, 272 F. Supp. 2d 1211, 1218 (D. Kan. 2003) (quoting *McKenzie v. Renburg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)). Here, it is undisputed that plaintiff complained to defendant that she should be paid as much as her boss, Mr. Winter, or should be required to work less

hours.[7]  Therefore, the court finds that plaintiff's complaint, although not formal or overtly asserting EPA

rights, does constitute protected activity.

Plaintiff also urges the court to consider the fact that, during plaintiff's employment with defendant,

plaintiff had a conversation with Ms. Smith regarding Ms. Smith's complaint about being paid less than

similarly-situated male employees.  Defendant concedes that, after learning of Ms. Smith's complaints, Mr.

Winter stated that Ms. Smith was "on a lot of thin ice."  The court is hesitant to characterize this situation as

a protected activity because plaintiff was not directly involved in Ms. Smith's unequal pay complaint.

However, reading the applicable EPA statute broadly, the court will give plaintiff the benefit of the doubt.

Defendant concedes that plaintiff's suspension and termination constitute an adverse employment

action.  Therefore, the next factor the court turns to is whether plaintiff can establish a causal connection

between her protected activity and her suspension and subsequent termination.  The court may infer a

retaliatory motive when an adverse action closely follows protected activity.  *Anderson*, 181 F.3d at 1179

(citing *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996)).  "However, unless the termination

is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence

beyond temporal proximity to establish causation."  *Id.* (citing *Conner*, 121 F.3d at 1395).  Plaintiff

contends that her protected activity occurred within four months of her suspension, and that this time period

is sufficient to presume a causal connection.  However, after taking into consideration the Tenth Circuit's

previous holdings on this subject, the court is hesitant to include a four month time period within the

definition of "very closely connected."  *See Richmond*, 120 F.3d at 209 (finding that a period of three

---

[7] The court is cognizant of the fact that, as plaintiff's supervisor, Mr. Winter has, at least
theoretically, more responsibilities and duties than plaintiff, which justifies a higher wage.  However, this
argument is better expressed as a legitimate, non-retaliatory reason for defendant's actions.

months between the protected activity and the alleged retaliatory action, standing alone, was insufficient);

*Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (holding that a one and a

half month period between the protected activity and the adverse action may, without more, establish

causation); *Annett*, 371 F.3d at 1240-41 (finding that a period of two to three months between the

protected activity and the alleged retaliatory action was sufficient to establish a prima facie case of

causation).

Even if the court were to stretch the Tenth Circuit's previous rulings and find that a four month time

period meets the causation requirement, however, defendant is still entitled to summary judgment because

plaintiff failed to assert that defendant's proffered legitimate, non-retaliatory reasons for its decisions were

pretextual.  Instead, plaintiff simply argued that she met the prima facie case of retaliation and failed to make

any pretext argument.  Accordingly, defendant is entitled to summary judgment on this claim.[8]  *See Cone*,

14 F.3d at 529 ("Failure to come forward with evidence of pretext will entitle the defendant to judgment.")

(citing *Burdine*, 450 U.S. at 256).

**F.**     **ADA and KAAD Claims**

---

[8] Plaintiff also asserts that her suspension directly followed a meeting between plaintiff and Ms. Smith, during which Ms. Smith's EPA complaint against defendant was discussed, and that this closeness in time establishes a causal connection.  Defendant contends that Mr. Winter was not aware of the topic of plaintiff's and Ms. Smith's conversation when he pulled plaintiff from the meeting.  The court declines to analyze this argument, finding it inconsequential following plaintiff's failure to make any argument for pretext on the part of defendant.

Plaintiff also asserts that defendant discriminated against her on the basis of her alleged disability in violation of the ADA and KAAD.[9]  Defendant contends that plaintiff cannot establish a prima facie case of disability discrimination under the ADA.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . the accommodation would impose an undue hardship. . . ."  *Id.* § 12112(b)(5)(A).  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* § 12111(8).  Thus, to establish a prima facie case under the ADA, plaintiff must demonstrate (1) that she is "disabled" within the meaning of the ADA; (2) that she is a qualified individual—with or without reasonable accommodation; and (3) that she was discriminated against because of her disability.  *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir. 1997).

In addition, the court will apply the burden-shifting framework set forth in *McDonnell Douglas* in analyzing plaintiff's ADA and KAAD claims.  411 U.S. 792, 802-05 (1973).  The first consideration before the court is whether plaintiff is disabled within the meaning of the ADA.  The ADA defines the term

---

[9] The court applies the same standards and burdens of plaintiff's KAAD claim as those applied to her ADA claim.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n.3 (10th Cir. 1997) (citing *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 767, 648 P.2d 234 (1982)).  Therefore, the court will analyze both claims simultaneously.

"disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 992 (10th Cir. 2001).  Plaintiff argues that she meets the disability requirement because she has a mental impairment that substantially limits one or more of her major life activities and there is a record of such impairment.  Defendant contends that plaintiff is unable to meet either of these disability definitions.

## A.      Actual Disability

The court must first determine if plaintiff suffers from a physical or mental impairment.  *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  Next, the court must identify the life activities affected by the impairment and whether those activities qualify as major life activities under the ADA.  *Id.*  Finally, the court must determine whether the impairment substantially limits the identified major life activities.  *Id.*

Whether the plaintiff has an impairment under the ADA and whether the identified activity is a major life activity are questions of law for the court.  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).  Whether the impairment substantially limits the major life activity is normally a question of fact for a jury.  *Id.*  However, "in proper circumstances a court may decide this step on a motion for summary judgment."  *Id.* at 1130 n.5 (citing *Bristol v. Bd. of County Comm'rs of County of Clear Creek*, 281 F.3d 1148, 1161 n.5 (10th Cir. 2002)).

A person is substantially limited in a major life activity if she is: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population

can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1); *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir. 2001).  Impairments that interfere in only a minor way with a major life activity do not qualify as disabilities.  *Toyota Motor Mfg., Ky., Inc., v. Williams*, 534 U.S. 184, 198 (2002).  In determining whether an impairment substantially limits a major life activity, the court should consider: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. § 1630.2(j)(2); *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254 (10th Cir. 2001).  Whether an impairment substantially limits a major life activity is determined on an individual, case-by-case basis.  *Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152 (10th Cir. 2002).

Plaintiff argues that she suffers from depression, which she contends is a recognized mental impairment that substantially limits her major life activities.  The Tenth Circuit has held that "it appears to be undisputed that depression is an impairment."  *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 495 (10th Cir. 2000).  However, a diagnosis of depression is not sufficient to prove a disability under the ADA; plaintiff must also demonstrate that her depression substantially limited her major life activities.  Plaintiff identifies several major life activities that she argues were affected by her depression—including her ability to care for herself, her ability to care for children and family, speaking, concentrating, learning, interacting with others, performing manual tasks, sleeping, and working for extended periods of time—that qualify as major life activities under the ADA.  *See* 29 C.F.R. § 1630.2(i) (defining "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"); *Doyal*, 213 F.3d at 495 (holding that major life activities include "caring for oneself, performing

-44-

manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working").

As a preliminary matter, defendant argues that several of plaintiff's alleged major life activities were not identified in either her amended complaint or in the pretrial order, and thus ought to be excluded from the court's consideration.  The court agrees.  *See Nowlin v. K Mart Corp.*, 50 F. Supp. 2d 1064, 1070 n.1 (D. Kan. 1999), *aff'd*, 232 F.3d 902 (10th Cir. 2000) (holding that the district court would not consider plaintiff's arguments that he was substantially limited in several major life activities because such claims were not included in the Pretrial Order).  Accordingly, the court will consider only the major life activities identified either in plaintiff's amended complaint or the Pretrial Order, which include caring for herself, sleeping, concentrating, speaking and working.

### 1.      Caring for Herself

Plaintiff contends that from February 1999 to after her termination, plaintiff was unable to care for herself.  Defendant argues that not only is the record void of any evidence which demonstrates that plaintiff was unable to care for herself at any relevant time, the record shows that plaintiff sought and received counseling on many different occasions, which supports a presumption that plaintiff was able to care for herself.

The record is silent as to specific instances of plaintiff's inability to care for herself.   Moreover, the record repeatedly states that plaintiff received counseling services from her psychotherapist, Ms. Hoskins, for stress, anxiety and depression associated with plaintiff's job, which suggests that plaintiff was able to care for herself by regularly seeking help for her problems.  *See Doebele v. Sprint Corp.*, 157 F. Supp. 2d

1191, 1209 (D. Kan. 2001), *rev'd on other grounds*, 342 F.3d 1117 (10th Cir. 2003) (citing *Cooper v.*

*Olin Corp., Winchester Div.*, 246 F.3d 1083, 1088 (8th Cir. 2001) (finding that defendants were entitled

to summary judgment when plaintiff cited no evidence that she was substantially limited in her ability to care

for herself on account of her alleged disability).  Accordingly, the court finds that plaintiff was not

substantially limited in her ability to care for herself.

### 2. Sleeping

Plaintiff also alleges that she is substantially limited in the major life activity of "excessive sleep".

Defendant argues that excessive sleep is not the type of evidence that supports a substantial limitation in the

area of sleeping.  The only facts plaintiff asserts regarding her sleep difficulties were that on November 2

and December 27, 1999, plaintiff saw Ms. Hoskins for depression, her inability to get out of bed, and

excessive tiredness.

Sleep is a major life activity.  *Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999).

However, the court disagrees with plaintiff's logic that her excessive sleep substantially limits her ability to

sleep.  To the contrary, relevant caselaw regarding sleep as a major life activity focuses on the lack of

sleep, not excessive sleep.  *Id.* at 1305-06; *Doebele*, 157 F. Supp. 2d at 2110.

Even assuming that plaintiff's excessive sleep could limit her other major life activities, such as

working or the ability to care for oneself, the court finds that plaintiff failed to provide any specific evidence

suggesting that plaintiff's excessive sleep was severe, long term or had a permanent impact on her other

major life activities.  The Tenth Circuit has specifically stated that generalized complaints of insomnia are

insufficient to establish a substantial limitation.  *See Smoke v. Wal-Mart Stores, Inc.*, 2000 WL 192806,

*4 (10th Cir. Feb. 17, 2000) (finding that there was "no way to determine from her generalized allegations

of sleep disturbance whether she was significantly restricted as to the condition, manner or duration of her ability to sleep as compared to the average person in the general population.").  In fact, plaintiff's only evidence regarding her excessive sleep was that, on two occasions, plaintiff sought counseling after experiencing an inability to get out of bed and excessive tiredness.  These facts, alone, do not constitute enough evidence for this court to find that her excessive sleep substantially impacted her other major life activities.[10]

### 3.    Concentrating

Plaintiff argues that she suffered from an inability to concentrate.  However, concentration is not a major life activity.  *See Doebele*, 342 F.3d at 1130 ("The [district] court properly rejected concentration as a major life activity."); *McCrary v. Aurora Pub. Schs.*, 57 Fed. Appx. 362, 370 (10th Cir. 2003) ("At the outset, we note that this court has held that concentration is not itself an [sic] MLA [major life activity], though it may be a component of some other MLA, such as working or learning.") (citing *Pack*, 166 F.3d at 1305).

### 4.    Speaking[11]

---

[10] In her response, plaintiff argued that she suffered from sleeplessness in addition to excessive sleep.  However, plaintiff did not include this contention in her complaint or in the Pretrial Order.  Moreover, the Tenth Circuit has stated that excessive sleep "precludes an inference that [plaintiff's] insomnia was severe, permanent, and untreatable enough to support a reasonable conclusion that she was significantly restricted in her ability to sleep." *Doyal*, 213 F.3d at 498.

[11] Plaintiff argues that she was substantially limited in her ability to interact with others but does not mention speaking.  However, the parties' Pretrial Order only alleges that plaintiff is substantially limited in her ability to speak.  Therefore, the court assumes that plaintiff substituted "speaking" for "interacting with others."  The court finds that speaking and interacting with others are two different and distinct abilities, and thus not interchangeable.  For instance, speaking is a major life activity, 29 C.F.R. § 1630.2(i), but interacting with others has not been formally recognized by the Tenth Circuit as a major life activity.  *See*

(continued...)

-47-

Plaintiff also argues that she was substantially limited in her ability to speak.  However, the record is silent regarding plaintiff's inability to speak.  While plaintiff alleges that she experienced communication difficulties with defendant at times, the court finds that communication difficulties are not analogous to a physical inability to speak.  Furthermore, the record reflects the fact that plaintiff sought and received counseling on numerous occasions, suggesting an ability to speak.  Thus, plaintiff has not sufficiently shown that she was substantially limited in her ability to speak.

### 5.     Working

Plaintiff argues that she was substantially limited in her ability to work because she attended regular bi-weekly doctor's appointments and, on two occasions, took medical leave to prevent exacerbations of depression, anxiety, stress and insomnia allegedly caused by work.  In addition, plaintiff alleges that her work suffered because she was impaired in her ability to effectively communicate with her supervisors, as evidenced by several e-mails, memorandums, notations and her performance evaluations.  Defendant contends that plaintiff was unable to work for, at most, three and a half months, which is not long enough to meet the definition of a substantial limitation under Tenth Circuit caselaw.  Additionally, defendant contends that plaintiff's alleged communication difficulties did not substantially affect her work.

Working is a major life activity.  *See* 29 C.F.R. § 1630.2(i).  To determine whether plaintiff is substantially limited in her ability to work, the court must consider whether plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the

---

[11](...continued)
*Steele*, 241 F.3d at 1254-55.  Therefore, following the court's earlier determination that it will consider only major life activities identified in either plaintiff's amended complaint or the Pretrial Order, the court will consider only the major life activity of speaking.

average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3).  In deciding

whether plaintiff was restricted in her ability to perform a class of jobs or a broad range of jobs in various

classes, the court may consider the following factors:

> (A) [t]he geographical area to which the individual has reasonable access;
>
> (B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Nowlin*, 50 F. Supp. 2d at 1070-71 (quoting *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir. 1994)

(quoting 29 C.F.R. § 1630.2(j)(3)(ii))).

Significantly, however, plaintiff did not specifically address her ability to perform any job other than

her own.  "The well-established law in the Tenth Circuit requires a plaintiff claiming a violation of the ADA

to prove more than an inability to perform [her] existing or former job."  *Barnard v. ADM Milling Co.,*

*Inc.*, 987 F. Supp. 1337, 1343 (D. Kan. 1997) (citing *Welsh v. City of Tulsa*, 977 F.2d 1415, 1417

(10th Cir. 1992)); 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not

constitute a substantial limitation in the major life activity of working.").  Instead, plaintiff made the general

statement that her bi-weekly doctor's appointments, medical leave and communication difficulties restricted

plaintiff from performing any job for which she was qualified within defendant's school district, but plaintiff

did not elaborate on which jobs she believed she was incapable of performing.  Therefore, because plaintiff

did not discuss her ability to perform any other job besides her job as Classified Personnel Administrator with defendant, plaintiff has failed to prove that she was substantially limited in her ability to work.

### B.  Record of a Disability

Having found that plaintiff is not disabled with respect to a "physical or mental impairment that substantially limits one or more . . . major life activities" pursuant to 42 U.S.C. § 12102(2), the court next turns to the issue of whether plaintiff meets the requirements of the same statute by demonstrating a record of her alleged impairment.

To prove a record of an impairment under the ADA, "a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Doebele*, 342 F.3d at 1132 (quoting *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir. 1999)).  Furthermore, "the record-of-impairment standard is satisfied only if she actually suffered [an impairment] that substantially limited one or more of her major life activities." *Id.* (quoting *Sorensen*, 194 F.3d at 1087) (quoting *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999))).

Plaintiff alleges that her medical leave constitutes a record of her impairment, and that her leave was recorded by defendant as an accommodation for her disability.  Defendant summarily argues that there is no record of plaintiff's impairment because plaintiff was not substantially limited in one or more of her major life activities.

Plaintiff did not elaborate on what she included in her alleged record of disability or to what extent defendant relied on this record.  Rather, plaintiff's only contention is that her medical leave created a record of a disability.  However, just because defendant was aware that plaintiff was taking medical leave does not automatically denote that defendant characterized plaintiff as having a disability.  In order create a record of

disability, plaintiff must have suffered from an impairment that substantially limited a major life activity in the past. *Doebele*, 342 F.3d at 1132. This court has already held, however, that plaintiff did not suffer from an impairment that substantially limited a major life activity. Therefore, plaintiff failed to meet the definition of "disabled" under the ADA. As such, the court grants summary judgment to defendant on this claim, and the court need not address plaintiff's allegation that defendant failed to accommodate her disability.[12]

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 110) is granted.

**IT IS FURTHER ORDERED** that this case is hereby dismissed.

Dated this 15th day of August 2005, at Kansas City, Kansas.

　/s Carlos Murguia　　　　　　
**CARLOS MURGUIA**
**United States District Judge**

---

[12] In her response, plaintiff suggests that defendant abandoned a protected activity argument as to plaintiff's ADA retaliation claim. However, plaintiff did not assert an ADA retaliation claim in either her first amended complaint or in the Pretrial Order. Therefore, the court declines to address this argument.